## In the Matter of BOUY, HALL AND HOWARD AND ASSOCIATES, A Georgia Partnership, Debtor.

### Bankruptcy No. 89–41946.

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

June 10, 1992.

---

9. 21 B.R. 643 (Bankr.D.Idaho 1982).

10. *Applegate v. Shuler (In re Shuler),* 20 B.R. 163, 164 (Bankr.D.Idaho 1982).

C. James McCallar, Jr., Savannah, Ga., for debtor.

Warren O. Wheeler, Atlanta, Ga., for Westinghouse.

Robert McCloud, Atlanta, Ga., for Lincoln Nat. Life Ins. Co.

## MEMORANDUM AND ORDER ON CRAMDOWN AND OBJECTIONS TO CONFIRMATION

LAMAR W. DAVIS, Jr., Chief Judge.

On April 2, 1992, this Court held a hearing to consider confirmation of the Debtor's proposed plan of reorganization. Because of the dissenting votes of two creditors, each classified separately under the plan, this Court was required to consider confirmation under the "cramdown" provisions of 11 U.S.C. Section 1129(b). After consideration of the evidence adduced at the April 2nd hearing, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

The Debtor is a partnership. Its sole business is the ownership and operation of a 171 room Quality Inn motel at the Savannah International Airport. The Debtor has continually owned and operated the motel since 1969. Since this case was filed on December 4, 1989, the Debtor has operated the motel as a debtor-in-possession.

The Quality Inn is built on land leased from the Savannah Airport Commission. The lease has a remaining term of 37 years. The motel is located very close to

the terminal building used by scheduled airlines as well as two "fixed base operators" who serve general aviation traffic.

The motel, its contents and rents are subject to a first priority security interest in favor of Lincoln National Life Insurance Company ("Lincoln") with a balance of approximately $1,355,718.35. The Lincoln loan originated on November 15, 1979, carried a 15 year term, amortized over 20 years with a balloon. The Lincoln note carried a "basic" interest rate of 9.75% plus "additional interest" payable monthly in an amount equal to 1% of gross room revenue. With the consent of Lincoln, the Debtor has used cash collateral during this case and paid Lincoln $25,000.00 per month plus 1% of gross room revenue since about March, 1990.[1]

The Debtor's plan places Lincoln alone in an impaired Class 6. It proposes to amortize Lincoln's debt over 10 years at 12% simple interest with a balloon at 8 years from the effective date of the plan. During the first 8 months from the effective date of the plan, the Debtor has the option to make one-half payments to Lincoln, using the difference exclusively for renovations to the motel which are required to satisfy the quality assurance standards of franchisor Quality Inns. Also, the Debtor is entitled to be up to 90 days late on no more than two payments per year to Lincoln.

The Debtor's managing partner, Mr. Harry Howard, testified that by using Lincoln's ballot figure as the amount of Lincoln's secured claim, the Debtor would pay a minimum of $9,725.31 a month for the first eight months. This would result in negative amortization at the end of the eighth month of $31,749.63 which when added to the initial balance would bring the amount to be amortized for the balance of the term to $1,387,467.98. The payments would then be $19,450.62 a month. Lincoln would receive $1,008,610.85 in interest over the life of the term and would have its principal reduced to $606,621.79 by the 96th

payment. Lincoln cast a negative vote on the plan.

The motel, its contents and rents are subject to a second priority security interest in favor of Westinghouse Credit Corporation ("Westinghouse"). Westinghouse did not file a claim, but announced at the April 2nd hearing that its note has a balance of $1,651,530.00. The Westinghouse loan originated in 1986, carried a four year term, optionally extendable for a fifth year. This was essentially an interest-only loan at "prime plus 2" with a minimum interest rate of 12% and a balloon nearly equal to the original principal amount of the loan. With the consent of Westinghouse, the Debtor has used cash collateral during this case and paid Westinghouse $17,000.00 each month since the case was filed.

The Debtor's plan places Westinghouse alone in an impaired Class 7. It proposes to amortize Westinghouse's debt over 20 years at 12% simple interest with a balloon at 8 years from the effective date of the plan. During the first 8 months from the effective date of the plan, the Debtor may optionally make one-half payments to Westinghouse, using the difference exclusively for renovations to the motel which are required to comply with the Quality Inn quality assurance standards. Also, the Debtor is entitled to be up to 90 days late on no more than two payments per year to Westinghouse.

Although Westinghouse testified that its debt was now reduced to $1,651,530.00, the Debtor used $1,834,224.72, the scheduled amount of the claim (there being no claim filed) for purposes of the Section 1129(b) hearing. Based on this figure, Mr. Howard testified that the Debtor would pay a minimum of $10,147.75 per month for the first eight months. This would result in negative amortization at the end of the eighth month of $68,642.62 which when added to the initial balance would bring the amount to be amortized for the balance of the term to $1,911,687.34. The payments would

---

1. Lincoln filed a ballot in the amount of $1,355.718.35 but announced at the hearing that its actual debt is somewhat higher. For the purposes of this Order, the Court will assume

that the Lincoln debt is the amount shown on the Lincoln ballot. Lincoln did not show how it has applied the Debtor's $25,000.00 monthly payments.

then be $20,295.49 a month. Westinghouse would receive $1,702,385.48 in interest over the life of the term and would have its principal reduced to $1,747,067.70 by the 96th payment. Westinghouse cast a negative vote on the plan and objected to confirmation.

All other classes or interests under the plan were either non-voting or voted to accept, or failed to cast a vote. Class 1 is a non-voting class comprised of Section 507(a)(1) through (6) claims. The only claims in the case that would be relevant are the balance of the United States Trustee's fees and the Debtor's attorney's fees. These will be paid on the effective date of the plan.

Class 2 is a non-voting class and consists of Section 507(a)(7) tax claims. These will be paid the allowed amount of the claim over a period not to exceed six years from the date of the assessment of the claim together with interest. These tax claims total $61,651.99 according to the plan and the Debtor proposes to reduce them over a period of six years. Assuming 12% simple interest, the Debtor would make payments to the authorities of $1,303.06 a month or $15,636.72 a year.

Class 3 is a non-voting class consisting of all other priority claims of which there are none known to the Court.

Class 4 consists of a creditor which has been satisfied.

Class 5 consists of the lease claim of GE Capital Corporation relating to personal property at the motel. The lease is being assumed under the plan with lease payments to GE Capital Corporation at $22,126.08 per year payable monthly.

Class 8 is Choice Hotels International, Inc., which is a franchisor/successor to Quality Inns International, Inc. The Debtor is a Quality Inn franchisee. The Debtor's plan proposes to assume the Quality Inn franchise and pay a pre-petition franchise fee arrearage over three years with interest. Choice Hotels is classified alone in Class 8 and has accepted the Debtor's plan. The payments to this class will amount to $3,323.52 a month or $39,882.24 for a twelve month period over three years.

Class 9 is the Savannah Airport Commission, the lessor of real property underlying the motel. The Airport Commission has accepted the plan which provides that the Debtor will assume the ground lease and make regular payments to the Airport Commission in the ordinary course of business.

Class 10 under the plan includes unsecured creditors holding claims smaller than $500.45. Claims in this class total $6,033.25 and will be paid in full within six months of confirmation. Class 10 has accepted the Debtor's plan.

Class 11 includes unsecured claims in excess of $500.45 which will be satisfied pro rata at the rate of $1,200.00 per month until all claims are paid in full. Class 11 claims total $111,489.93. Class 11 has accepted the Debtor's plan.

Class 12 includes claims of insiders which will be paid only after all other claims in the case are paid in full. The Debtor's managing partner, Harry Howard, testified that the partners have taken, and intend to take, no management fee or other distribution from the motel during this case except for Mr. Howard's salary, which does not exceed $2,000.00 per month.

The Debtor introduced the testimony of Mr. William Atkinson to establish that the plan treatment of dissenting creditors Lincoln and Westinghouse is "fair and equitable" within the meaning of 11 U.S.C. Section 1129(b). Mr. Atkinson is a former commercial loan officer with three Savannah-area banks and has 20 years experience as a commercial lender.

Atkinson testified that the proposed interest rate of 12% is higher than the current commercial loan rate of 9½%. According to Atkinson, a longer term loan typically commands a higher interest rate to protect the lender against fluctuations in the market interest rate. He testified that the Debtor's proposed 12% rate is commercially reasonable given the eight-year term of the loan.

Atkinson also testified that the provision for one-half payments during the first

eight months of the plan—essentially a negative amortization proposal—would be unusual in a new loan used to acquire an income producing property. However, Atkinson stated that the objective of the plan, freeing the Debtor's cash flow to make capital improvements to the lender's collateral, would typically be accomplished on a new loan by a commercial lender in one of two ways:

1) Make a short term, single-payment balloon loan, which would be refinanced into a long term installment loan at the end of the 8 month "negative amortization" period; or

2) Lend extra money to finance renovation and amortize that additional principal over the life of the long term loan.

Atkinson also testified that the plan provision expressly permitting not more than two payments per year to be up to 90 days late was commercially unusual, but that in an ordinary commercial loan to a business with a two-month "slow season," it would be typical for a lender to amortize its loan in such cases on the basis of 10 rather than 12 annual payments. The effect of the Debtor's proposal is no less favorable to the lender than a 10 annual payment amortization.

Lincoln and Westinghouse offered no evidence to rebut Atkinson's credible testimony.

This Court has heard widely disparate estimates of the value of the Debtor's motel. The Debtor submitted an appraisal with its Disclosure Statement suggesting that the property has a value of $5,165,000.00. That value is consistent with the Chatham County Tax Assessor's 1992 valuation of $4,864,440.00. Lincoln and Westinghouse allege that the motel is worth only $2.9 million based on a recent appraisal by Brian Considine, a qualified commercial real estate appraiser.

In doing his appraisal, Mr. Considine disregarded the "comparable sales" appraisal technique and gave virtually no weight to the "reproduction cost" appraisal technique which would have resulted in an appraisal of $3.45 million.

The "income approach" requires an appraiser to project the income and expense associated with the appraised property, and to discount that income stream using an appropriate capitalization rate. Mr. Considine's appraisal was based on a number of assumptions leading inevitably to a low valuation.

In projecting the Debtor's income and expense, Mr. Considine used the Debtor's actual gross income and expense figures for only two years—1990 and 1991. Harry Howard testified that 1991 was a disastrous year for the Quality Inn due to the Gulf War, the bankruptcy of Eastern Airline, and the national recession which hurt the entire hospitality industry.[2] Considine agreed that 1991 was an aberrant year but nonetheless used 1991 revenue figures together with 1990 figures to project the Debtor's future income.

Considine projected the Debtor's income and expenses for only four years. He projected a ten occupancy point drop in year four based on reports that the commercial airline terminal will be moved across the field to the other side of Savannah International Airport in year four. He assumed that all passenger operations would be relocated to the new terminal facility and that new hotels will be built near the Debtor's motel and the Days Inn which will keep occupancy and average daily rate ("ADR") low. However, at present there is no existing hotel located closer to the new terminal than Debtor's property.

On cross examination, Considine admitted that the Quality Inn derives negligible income from airline passengers. He also admitted that movement of the airline terminal was likely to have only a transitory

---

**2.** The Debtor rents a significant number of rooms to the military in conjunction with training exercises conducted at the Air National Guard facility at Savannah International Airport. Mr. Howard testified that the military business disappeared during the Gulf War.

Eastern Airlines formerly lodged its flight crews with the Debtor. The Eastern business has now been replaced as the result of lodging contracts with Key Airlines, a new carrier in the Savannah market.

effect on business at the Quality Inn. Despite those admissions, Considine's appraisal is based on the assumption that the Net Operating Income of the Quality Inn will stabilize at the "year four" level, the year in which he predicted the maximum negative impact from movement of the terminal. While the Court can appreciate the reasons for taking a conservative approach to valuation in light of the uncertainty over the terminal relocation, I find that the stabilization of income at year four is an unduly pessimistic assumption on which to base the valuation, particularly in view of the testimony of Mr. Howard and his success in rebuilding the motel's business following prior set backs.

Mr. Considine elected to use a 1990 capitalization rate of 11.5% in arriving at his income approach valuation. He admitted that interest rates have generally fallen since 1990, but denied knowing the appropriate 1992 capitalization rate. He admitted that the capitalization rate generally parallels the market interest rate. He admitted that a 1% reduction in the capitalization rate would produce an approximate $180,000.00 increase in the income approach valuation of the subject property. Considine also deducted management fees totaling 6% of revenues before calculating net operating income. His rationale was that any investor would incur such expense and would value the property lower due to the lower net income. The net effect of Mr. Considine's assumptions in preparing this appraisal was to produce an "income approach" value of $2.9 million.

In this case, however, the Debtor has replaced outside management in an effort to save the motel and at present is charging only $12,000.00 per year for Mr. Howard's expertise, in contrast to the theoretical 6% fee which would amount to approximately $100,000.00 per year. This $80,000.00—plus annual savings means that as long as Debtor manages and owns

the property, the net income realized by the estate is higher and the value of the motel is increased. I therefore conclude that Considine's appraisal of $2.9 million is too low and that the value of this motel is at least $3.3 million based on the capitalization rate adjustment and the management fee savings. Since the first and second mortgage debt to Lincoln and Westinghouse totals approximately $3,000,000.00 I find there is at least $300,000.00 equity cushion in the property. Counsel for Westinghouse announced his belief that the value of the motel is slightly greater than the aggregate debts of Lincoln and Westinghouse, whatever the precise amount of those debts.

I find that the proposed plan is feasible. The Debtor projects higher net operating income over the life of the plan than Considine, based on higher projected revenue and lower costs. The Debtor submitted a Ten Year Schedule of Income, Expenses and Cash Flow which includes the actual income and expenses for the years 1990 and 1991. The Debtor's schedule was prepared by Mr. Howard in concert with Bernard Hirsch, a Certified Public Accountant. They have handled the partnership's finances since the Debtor's motel business began and based their projections on more than 20 years of actual income and expense figures.

According to Mr. Howard's projections, the Debtor's lowest net operating yearly income over the next eight years [3] would be at least $660,676.00.[4] The yearly payments to Lincoln would total $233,407.44 and the yearly payments to Westinghouse would total $243,545.88 for total yearly payments to these secured creditors of $476,953.32.

Based on the Debtor's projections the Debtor will be able to satisfy the financial commitments in the proposed plan during its leanest year—1992—with a projected net operating income of $660,676.00 and

---

3. The Debtor's Ten Year Schedule sets forth numbers which form the basis of the total calculated on the attached Schedule A.

4. This figure is taken from Schedule A and is based on the fact that Debtor will not be drawing management fees.

creditor payments of $568,998.36.[5] Present management is efficient and aggressive and even Mr. Considine agrees that Mr. Howard has done a good job in attracting a diverse group of core customers. I find that the Debtor's plan is feasible and that the Debtor is not likely to require further reorganization following confirmation of the plan.

The Westinghouse objection to confirmation (which was orally supported by Lincoln at the hearing) of Debtor's plan asserts several objections:

1) That the plan provides for a negative amortization of the Westinghouse and Lincoln debts and is, therefore, not fair and equitable *per se* within the meaning of 11 U.S.C. Section 1129(b);

2) That the right of Debtor to miss up to two monthly payments of principal and interest per year is not fair and equitable within the meaning of 11 U.S.C. Section 1129(b);

3) That the plan improperly classifies certain entities as non-insiders; and

4) That the plan unfairly discriminates in its treatment of Class 8.

## CONCLUSIONS OF LAW

Westinghouse and Lincoln, the only two secured creditors of Debtor, comprise the only classes which have rejected the plan. They are impaired and Debtor moved the Court pursuant to Section 1129(b)(1) of Title 11 to confirm its Chapter 11 plan notwithstanding the requirements of Section 1129(a)(8). This Court must, therefore, determine if the plan discriminates unfairly against these creditors and whether the plan is fair and equitable with respect to these two dissenting classes.

### A. *Negative Amortization*

The plan affords the Debtor the opportunity during the first eight months from the effective date of the plan to optionally make one-half payments to these two secured creditors using the withheld difference exclusively for renovations to the motel which are required to comply with the Quality Inn quality assurance standards.

Negative amortization is not *per se* unfair and inequitable to creditors. *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174 (9th Cir.1992). In *Great Western* the Ninth Circuit examined relevant case law and concluded that while some negative amortization plans have been rejected the majority view is that there should be no *per se* rule. Rather, the Court held that approval of such plans was to be made on a case-by-case basis and adopted a non-exclusive list of the factors to be considered:

1) Does the plan offer a market rate of interest and present value of the deferred payments;

2) Is the amount and length of the proposed deferral reasonable;

3) Is the ratio of debt to value satisfactory throughout the plan;

4) Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5) What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6) Are the risks unduly shifted to the creditor;

**5.** Worst case creditor payments under the proposed plan:

| | |
|---|---|
| Class 2–Non–voting tax claims | $ 15,636.72 per year |
| Class 5–G.E. Capital | $ 22,126.08 per year |
| Class 6–Lincoln | $233,126.08 per year |
| Class 7–Westinghouse | $243,545.88 per year |
| Class 8–Quality Inn/Choice | $ 39,882.24 per year |
| Class 9–Included in NOI | |
| Class 10–Unsecured under $500.45 (will be paid w/i 6 months of confirmation) | |
| Class 11–Unsecured over $500.45 | $ 14,400.00 per year |
| Class 12–Insiders (will be paid nothing until all other classes paid in full) | |
| Total | $568,998.36 |

7) Are the risks borne by one secured creditor or class of secured creditors;

8) Does the plan preclude the secured creditor's foreclosure;

9) Did the original loan terms provide for negative amortization; and

10) Are there adequate safeguards to protect the secured creditor against plan failure.

*Id.* at 1178.

The Ninth Circuit made clear that courts need not expressly refer to each factor in reaching their decisions. Moreover, I find some of these factors to be cumulative of this Court's duty to apply Section 1129 in confirming a plan. For example, factor 1 is subsumed by 11 U.S.C. Section 1129(b)(2)(A); factor 4 is a restatement of Section 1129(a)(11): factor 7 is part of the Section 1129(b)(1) inquiry as to unfair discrimination among classes of claims, and factors 8 and 10 are satisfied (unless the plan limits a creditor's post-confirmation foreclosure) by the provisions of 11 U.S.C. Section 1141(b) and Section 362(c)(1). In essence, factor 2 is the key inquiry and factors, 3, 5, 6, and 9 are elements of the pivotal inquiry: Is the amount and length of the proposal deferral reasonable in light of all the facts and circumstances of the case?

I share the "commonly held reservations" about negative amortization plans. *Id.* at 1177. Certainly they are "fraught with pitfalls" that may unfairly endanger creditors. *Id.* Nevertheless I conclude that this negative amortization plan is fair and equitable.

█ The amount of the proposed deferral is reasonable. The maximum amount of deferred interest would be slightly over $100,000.00 and amounts to only 3% of the total debt and only one-third of the equity cushion in the property. Moreover, the deferral would only be authorized to the extent that improvements are made to the

motel on a dollar-for-dollar basis. Thus, there should be no erosion of the equity cushion. As a dollar is diverted temporarily from debt service to improvements, the debt increases, but so will the value of the property. Nor is the term of the deferral excessive. It would amount to eight months maximum, the period of time necessary to complete the improvements, and no longer. The motel is stable in value at present, is managed extremely well, and is being effectively marketed to a diverse and growing customer base. If anything, the motel value may appreciate over time as the market recognizes that the property has been "spruced up" and that even the feared airport terminal relocation is unlikely to have a lasting impact on the motel's revenues. Indeed, this relocation has clearly had a chilling effect on the market's perception of the motel's worth, but one which I find has already been fully incorporated into the Considine appraisal, as modified by my findings. Given a "bottomed-out" value, and solid management I find the ratio of debt to value will not erode, and even with negative amortization for eight months, that a 10% equity cushion is sufficient to protect the creditors. As a result, there is no undue shift of risk to the secured creditors in this plan.[6]

In light of the foregoing I conclude that the amount and length of the proposed deferral is reasonable and that the proposal as set forth in the plan is fair and equitable. While it is true that neither creditor bargained for a negative amortization loan, given the particular facts of this case, that factor alone should not be controlling. *See In re Club Associates*, 107 B.R. 385 (Bankr.N.D.Ga.1989). There the maturity date on a note which provided for negative amortization was extended for five years. Total additional negative amortization under the plan was 1.7 million on a note for $22 million (7% of debt) and extended over

---

6. For an example of a negative amortization plan which was held to fail the fair and equitable test *see FSLIC v. D & F Construction Co.*, 865 F.2d 673 (5th Cir.1989). There, the plan called for extension of a short-term construction loan on property in which there was no equity for 15 years, failed to reduce principal for 12

years, deferred any significant principal reduction for the entire 15 years and was based entirely on speculation as to future substantial improvements in the Texas real estate market. This is a factually distinguishable case.

a period of seven years on property that was fully encumbered with no equity cushion. In this case, both Lincoln and Westinghouse are treated as fully secured creditors under the terms of the plan. The period of interest deferral is short, the amount more than protected by the Debtor's equity and the funds saved will be devoted solely to improving the property. Creditors will retain their respective liens over pre-petition collateral and each will receive an account of its claim deferred cash payments with a present value equal to its allowed secured claim. This satisfies the fair and equitable requirement. 11 U.S.C. § 1129(b)(2)(A).

■ The 12% interest proposed by Debtor satisfies Section 1129(b)(2)(A)(i)(II). The Eleventh Circuit in determining the standard for an appropriate discount interest rate stated that this Court must "consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default." *United States v. Southern States Motor Inns, Inc.*, 709 F.2d 647, 651 (11th Cir.1983). In this case the proposed interest rate is equal to or greater than the contract rates of the dissenting creditors and commercially reasonable in light of the 8–year term of the plan.

### B. *Late Payments*

■ The right of the Debtor to be late on not more than two monthly payments of principal and interest per year is neither unfair nor inequitable in the context of this case. Mr. Howard testified that under the Debtor's plan, it could be up to 90 days late on no more than two payments per year to Lincoln. This is due to the fact that on occasion the receipt of major receivables may be delayed. There may also be exigent circumstances which arise in a given month. The delay will only be temporary and for no longer than 90 days.

In an ordinary commercial loan to a business with a two-month "slow season," it would be typical for a lender to amortize its loan on the basis of 10 rather than 12 annual payments. While the Debtor's proposal is not commercially typical, it is still commercially reasonable where the effect of the Debtor's proposal is more favorable to the lenders than a more conventional 10 annual payment amortization.

### C. *Payments to "Insiders"*

■ Westinghouse also objected to confirmation on the theory that an "insider" within the meaning of 11 U.S.C. Section 101 was improperly classified with unsecured creditors under the plan. Westinghouse did not raise the issue at the confirmation hearing and has presumably abandoned it. In fact, the plan treats Bouy and Hall Homes, Inc., as a Class 11 unsecured creditor. There is no evidence that Bouy and Hall Homes, Inc., is an insider within the meaning of 11 U.S.C. Section 101, or that the unsecured claim of Bouy and Hall Homes, Inc., is objectionable. To the extent that Westinghouse's objection is an absolute priority objection, it is not available to this secured creditor which will be paid in full. *See In re Club, supra.*

Since the dissenting creditors will receive 100% of their allowed claims the provisions of Section 1129(a)(7) are satisfied. The plan complies with the applicable provisions of the Bankruptcy Code and was proposed in good faith. The Debtor has disclosed the identity of Mr. Howard, a general partner who will serve as managing partner and his compensation of $25,000.00 per year.[7]

### D. *The Class 8 Claim*

■ Lincoln objects to the payment of this unsecured claim over a three year period, a shorter term of payment than the secured creditors will receive arguing that such a term unfairly discriminates in violation of 11 U.S.C. Section 1129(b)(1). I overrule that objection because Debtor is curing a default under its Quality Inn franchise agreement and assuming that con-

---

**7.** Howard testified that he was in fact receiving only $12,000.00 per year. While Debtor may reserve the right to increase that figure, I rule that it may not do so during the time of any interest deferral.

tract, pursuant to 11 U.S.C. Section 365. This is not a case in which one unsecured creditor is paid more favorably than another unsecured creditor similarly situated. Instead, because of Section 365, Choice Motels is entitled to separate classification and different treatment, including prompt cure of any pre-petition default. Choice has agreed to accept payments, pursuant to its right to prompt cure, over a period of 36 months and I conclude that due to the specialized provisions of Section 365 such a payout does not constitute unfair discrimination.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS THE OR-DER OF THIS COURT that the objections of Westinghouse to confirmation of Debtor's plan are denied. By separate order this Court will confirm the Debtor's Chapter 11 plan pursuant to 11 U.S.C. Section 1129(b) upon Debtor's filing of an amendment clarifying the treatment of Classes 6 and 7 by:

1) Setting forth the precise debt of Westinghouse and Lincoln;

2) Amortizing Lincoln's debt over 10 years at 12% based with a balloon in 8 years; and

3) Amortizing Westinghouse's debt over 20 years at 12% with a balloon in 8 years.

SO ORDERED.

| | | SCHEDULE "A" | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| : | | 1990 | : | 1991 | : | 1992 | : | 1993 | : | 1994 | : |
| : | *GOI= | $2,487,969.27 | : | $2,343,089.42 | : | $2,750,451.43 | : | $2,887,973.99 | : | $3,032,372.70 | : |
| : | *Less | $1,938,615.55 | : | $1,907,039.45 | : | $2,089,774.45 | : | $2,178,138.52 | : | $2,274,608.26 | : |
| : | *NOI= | $549,353.72 | : | $436,049.97 | : | $660,676.98 | : | $709,835.47 | : | $757,764.44 | : |
| : | | 1995 | : | 1996 | : | 1997 | : | 1998 | : | 1999 | : |
| : | *GOI= | $3,183,991.33 | : | $3,343,190.90 | : | $3,510,350.44 | : | $3,685,856.96 | : | $3,870,161.37 | : |
| : | *Less | $2,378,077.11 | : | $2,488,003.02 | : | $2,604,182.54 | : | $2,726,617.90 | : | $2,855,438.63 | : |
| : | *NOI= | $805,914.22 | : | $855,187.88 | : | $906,167.90 | : | $959,239.06 | : | $1,014,722.74 | : |

*GOI=Gross Operating Income
*NOI=Net Operating Income
*Total expenses less debt service, depreciation and management fee.