In re Jeffrey Charles NAUMAN, Brenda Sue Nauman, Debtors.

Gary L. MILLER; June W. Miller; John P. Belza; Virginia D. Belza; Appellants,

v.

Jeffrey Charles NAUMAN; Brenda Sue Nauman; First Security Bank; Robert K. Morrow, Trustee; United States Trustee; Appellees.

BAP No. OR–97–1264–JHN.

Bankruptcy No. 396–36120–elp12.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Aug. 21, 1997.

Decided Sept. 18, 1997.

Before: JONES, HAGAN, and NAUGLE [1], Bankruptcy Judges.

## *OPINION*

JONES, Bankruptcy Judge.

The bankruptcy court confirmed the Debtors' Chapter 12 Family Farmer Reorganization Plan by its order of February 27, 1997. Creditors Gary and June Miller and John and Virginia Belza ("Miller–Belza"), who sold the ranch property to the Debtors, now appeal the confirmation order. Specifically, the Appellants argue that the bankruptcy court erred in that the Debtors' plan fails the feasibility requirement of § 1225(a)(6).[2] Miller–Belza also argue that the plan involves negative amortization of the ranch property, and that the negative amortization plan does not meet the factors approved by the Ninth

---

1. Hon. David N. Naugle, Bankruptcy Judge for the Central District of California, sitting by designation.

2. Unless otherwise indicated, all references to Chapters, Sections and Rules are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, and to the Federal Rules of Bankruptcy Procedure, Rules 1001, *et seq,*

Circuit in *Great Western Bank v. Sierra Woods,* 953 F.2d 1174 (9th Cir.1992). We **AFFIRM** the decision of the bankruptcy court.

## I. FACTS

The Debtors, Jeffery Charles Nauman and Brenda Sue Nauman, acquired a cattle ranch in central Oregon in February of 1995. The ranch consists of two separate properties: the Keyes Mountain parcel is approximately 2,768 acres and the Ranch Site parcel is approximately 2,582 acres. The Naumans originally sought to acquire only the Ranch Site parcel. The Appellants, the Millers, were interested in purchasing only the Keyes Mountain property. Mr. Miller is a California real estate broker. The then-owner of the parcels was unwilling to sell only one parcel at a time. Ultimately, a deal was struck in which the Appellants, the Millers and the Belzas, would purchase both parcels and simultaneously sell the Ranch Site property to the Naumans.

In January of 1995, the Millers and Belzas purchased both parcels. The Ranch Site property was purchased for $775,000.00. The agreement required annual installments of $50,194.00. The first payment, however, was to be $46,829.42. The balance would be due in January of 2005. Miller–Belza also purchased the Keyes Mountain property for $725,000.00 with annual installments of $34,845.00. The balance on this property would also be due in the year 2005.

Miller–Belza sold the Ranch Site property to the Naumans on the same day that Miller–Belza acquired it from the previous owner. The sale contract between the Naumans and Miller–Belza for the Ranch Site property required a purchase price of $775,000.00, with a $300,000.00 down payment. The remaining $475,000.00 was to be paid in annual installments with an 8.5% interest rate. The annual installments were to be $50,218.00, with the exception of the first year, in which the payment was to be $42,032.38. The annual payments were to continue until January 3, 2005, when the full balance would be due. The sale contract gave Miller–Belza the right to foreclose on the property in the event of default. The Naumans also ac-quired grazing rights to the Keyes Mountain property.

The Naumans failed to make the 1996 payment on the Ranch Site property and filed for bankruptcy protection in August of 1996. The value of the property at that time was estimated at $750,000.00. Two debts are secured by the Ranch Site property. The first was the Miller–Belza debt in the amount of approximately $545,000.00, and the second was a deed of trust in favor of William Nauman, the Debtor's father, for $91,000.00. Another loan by First Security Bank for $100,000.00 is secured by the cattle herd.

The Debtors have some experience in the cattle industry. Testimony in the lower court indicated that prior to the purchase of the Oregon property, Jeffrey Nauman had operated a cattle ranch in Idaho. He is a member of the Oregon Cattlemen's Association, he was selected to represent Oregon on a nationwide Cattlemen's tour, and he chairs the Association's Land Resources Committee.

At the time of the filing of bankruptcy, the Naumans' business operations had three components. First, there was a cow-calf operation in which the calves were sold off of the ranch. Second, the Naumans shipped many of their calves to a feedlot for additional weight gain before sale. By sending the cattle to the feedlot, the Naumans delay the sale of the cattle in hopes of taking advantage of an anticipated market increase in cattle prices. Third, the Naumans had a "bed and breakfast" operation in a second house on the property.

The bankruptcy court held hearings regarding the Debtors' plan on December 10, 1996, January 6, 1997, and January 24, 1997. The court issued its oral opinion on February 5, 1997, with a modification thereto on February 24, 1997. The court entered its written order on February 27, 1997. This appeal followed.

## II. ISSUES

Did the bankruptcy court err in finding that the plan was feasible under § 1225(a)(6)?

Did the bankruptcy court err in allowing negative amortization of the Ranch Site property?

## III. STANDARD OF REVIEW

 Whether a debtor's plan is feasible under § 1225(a)(6) is a factual determination. *In re Rape,* 104 B.R. 741, 748 (W.D.N.C. 1989); *In re Crowley,* 85 B.R. 76, 78–79 (W.D.Wis.1988); *see also In re Webb,* 932 F.2d 155, 158 (2d Cir.1991). The fairness of a negative amortization plan is also a question of fact. *Corestates Bank v. United Chemical Technologies,* 202 B.R. 33, 52–53 (E.D.Pa.1996) (citing *Great Western Bank v. Sierra Woods Group,* 953 F.2d 1174, 1176–77 (9th Cir.1992)). All findings of fact are reviewed under a clearly erroneous standard, and we give due regard to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Fed.R.Bankr.P. 8013. "A finding of fact is clearly erroneous when after reviewing the evidence we are left with the definite and firm conviction that a mistake has been committed." *In re Arnold and Baker Farms,* 177 B.R. 648, 653 (9th Cir. BAP 1994) (citing *In re Contractors Equip. Supply Co.,* 861 F.2d 241, 243 (9th Cir.1988)), *rev'd,* 85 F.3d 1415 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997).

## IV. DISCUSSION

A. *Feasibility of the Plan*

 The Appellants argue that the bankruptcy court erred in confirming the Debtors' plan because it does not meet the feasibility requirement of § 1225(a)(6). Specifically, subsection 1225(a)(6) requires that "the debtor will be able to make all payments under the plan and to comply with the plan." Under this subsection, "[t]he debtor is not required to guarantee the ultimate success of his plan, but only to provide a reasonable assurance that the plan can be effectuated." *In re Hopwood,* 124 B.R. 82, 86 (E.D.Mo. 1991). However, this reasonable assurance must rise above "bare agronomic feasibility." *In re Crowley,* 85 B.R. 76, 79 (W.D.Wis. 1988). The *Crowley* court stated that

[s]uch a technical agronomical feasibility determination generally includes a variety of assumptions and the likelihood that these assumptions will occur must be determined by the Court.... Because past behavior and productivity are excellent indicators of future productivity, courts have frequently rejected plans which are premised on highly optimistic projections of increased production.

*Id.* at 79 (citing *In re Cott,* 49 B.R. 570 (Bankr.W.D.Mo.1985); *In re Reitz,* 79 B.R. 934 (Bankr.Kan.1987); *In re Konzak,* 78 B.R. 990 (Bankr.N.D.1987)).

 Since the Appellants argue that the Debtors' plan is not feasible, the details regarding the ranch's historic performance and the distinguishing characteristics of the Debtors' current operation plan are relevant. The Appellants present four main arguments as to why the confirmed plan is not feasible. These arguments are discussed below.

1. **The Appellants argue that the ranch capacity will not support the Debtors' proposed operation.**

The lower court found that the Debtors' plan was reasonable and rejected the creditors' contention that the Debtors' planned increase in herd size would overtax the ranch. The ranch is at an elevation of between 4,000 and 5,000 feet above sea level and sometimes experiences severe winters. The previous owner of the ranch had owned the ranch for only three or four years prior to its sale, but indicated that the ranch had historically carried approximately 200 cows.

The Debtors' cow-calf operation consists of both owned and leased cows. At the time of the confirmation hearing, the Naumans had 91 owned cows and 197 leased cows. In 1997, the Debtors anticipate owning 90 cows and leasing 221 cows from other parties. During the summer months, they will also graze 100 yearlings owned by third parties. Mr. Nauman, the debtor, testified that prior to purchasing the ranch, he had been told that there had previously been 325 cows on the ranch year-round and up to 500 stocker cattle in the summer months. Although Appellants' brief claims that there was uncontradicted evidence that the winter carrying

capacity of the ranch was 200 cows, the record on appeal indicates that the carrying capacity was the subject of varying testimony. The issue is further complicated by the fact that the question of carrying capacity is different from the question of the historical number of cattle on the ranch. Additionally, testimony in the lower court indicated that differences in management practices can affect carrying capacity.

The Debtors' management practices differ from those historically found on the ranch. Testimony in the bankruptcy court indicated that the previous owner ran a large-framed breed of cattle, which required a large amount of feed in order for them to calve during the winter months. Regarding grazing practices, the previous owner divided his herd among the available fields and left them there for the entire season. In contrast, the Naumans put a larger number of cattle in one field for a much shorter period of time, and require the cattle to eat everything in the field. The cattle are then moved out of the field for several months, allowing the forage to regrow. The forage in the fields is closely monitored throughout the year. Testimony in the lower court indicated that this approach is not traditional, but that it can be more efficient and can increase the carrying capacity of a given property.

The bankruptcy court found there was contradictory testimony regarding how many animals had been on the ranch historically and what change the Debtors' field management practices would have on the carrying capacity. As there were two sets of opinions on the subject, we cannot say that the bankruptcy court committed clear error in adopting the opinions favorable to the Debtors.

2. **The Appellants argue that the Debtors' projection for calf and fed steer prices are not supported by historic markets or the projections of experts in the cattle futures market.**

At the February 5, 1997, hearing prior to confirmation, the court noted that the Debtors' plan assumes that the cattle market is at the bottom of a price cycle and that prices will improve in the future. Based on the testimony provided by various witnesses, the bankruptcy court found this assumption to be reasonable. Besides increasing the productivity and efficiency of the ranch through the above methods, the Debtors are also seeking higher prices for the cattle they sell. Rather than sell the cattle at the local market price, the Debtors have begun selling their cattle through a specialized beef marketing firm ("the B3R program") that offers higher prices for so-called "natural beef"—cattle that have not been exposed to hormones or antibiotics. Testimony in the bankruptcy court indicated that this marketing firm has been in operation for the last ten years, and can offer between four and ten cents per pound more for cattle that are considered "natural." The marketing firm's demand for this type of beef currently exceeds its supply.

The Debtors also expect to increase revenue by taking advantage of an expected upswing in cattle market prices. Testimony in the bankruptcy court indicated that the cattle industry has been experiencing some of the most economically stressful times in its history, and that cattle prices are cyclical. The market price of cattle is expected to begin its increase in middle to late 1997. This upswing is expected at this time because, due to last year's market conditions, many cattle producers began liquidating their cattle, and thus the cattle supply has decreased somewhat. With the expected climb of cattle prices, the Debtors plan to retain ownership of the cattle by sending them to feedlots. By doing so, the Debtors plan to take advantage of the anticipated price increase as well as the cattle's additional weight gain. Testimony and market publications presented in the lower court suggested that extended ownership of the calves was a low-risk method of enhancing returns.

Regarding the Debtors' projections of future market prices, testimony in the trial court by the feedlot owner as well as the Debtor indicated that the Debtors' price projections are conservative. As provided in the bankruptcy court, the following are the Debtors' price projections, including the natural beef premium of between four and ten cents per pound, compared to the feedlot owner's projections of the generic base price (the price without a premium) for fed cattle:

| | Debtors' Projected Premium Price | Feedlot Owner's Projected Base Price |
|---|---|---|
| 1997 | $.71 per pound | $.68 to $.72 per pound |
| 1998 | $.75 per pound | mid $.70's to low $.80's |
| 1999 | $.79 per pound | mid $.70's to low $.80's |

These figures illustrate that the Debtors' price projections, even including the natural beef premium, are within the range of what the base price is expected to be. Further, the Debtors are somewhat experienced in feedlot prices, having placed some of their 1994 calves and all of their 1995 calves in the feedlot operation. Lower court testimony indicated that despite high feed costs and fed-cattle prices as low as $.56 per pound in 1995, the Debtors made a profit on their 1995 calves. At the time of the bankruptcy court hearings, the base price for fed cattle was $.67 per pound.

In seeking to maximize their revenue with the feedlot strategy, the Debtors plan to purchase some calves and place them directly on the feedlot. The Appellants argue that the Debtors' price projections for calf and fed cattle are not supported by historic market prices. Specifically, the Debtors project that they will sell fed cattle in the fall of 1997 for a base price of $.67 per pound, pay $.70 per pound for feeder calves in January of 1998, and sell fed cattle for a base price of $.71 per pound. The Appellants argue that these numbers are unrealistic because the per-pound price paid for feeder calves normally exceeds the per-pound price received for fed cattle. However, there was also testimony in the lower court suggesting that since the Debtors are not buying feeder calves and selling them as fed cattle on the same day, the prices of the two animals for a given day cannot be compared. The calves will be kept for a number of months and the market price is expected to climb during that period. Additionally, testimony during the hearings suggested that fed-cattle prices, which the Debtors will be selling, will begin increasing before the price of the feeder calves, which the Debtors will be buying.

Further, during the bankruptcy court proceedings, the Debtors submitted various budget scenarios, one of which dealt with the possible increase in the price paid for feeder calves. Testimony presented in the lower court indicated that the plan was still workable under those various scenarios. Without explanation, the Appellants' brief singles out one of those scenarios (Exhibit 17) and labels it as the Debtors' plan. Although the Appellants are correct that the total profit over five years under that scenario is less than $5,000.00, this scenario is only one of several scenarios presented to the bankruptcy court. Of the several projections included in the record on appeal, the Appellants have presented no evidence that Exhibit 17 was considered by the bankruptcy court to be the Debtors' most probable projection.

Based on the above, we cannot say that the lower court was clearly erroneous in this regard.

**3. The Appellants argue that the Debtors' plan does not show any margin to cover unexpected contingencies.**

During the hearings prior to confirmation, the lower court indicated that one of the assumptions of the plan is that the Debtors' performance under the plan will exceed the ranch's historic performance due to improved management practices. These practices include a different grazing pattern for the cattle, shifting the calving season to later in the year to avoid the harsher winter season, and different nutritional practices. The Debtors claimed that these changes would reduce the winter feed requirements from the historic two tons per animal to only one-third ton per animal. At the February 5 hearing, the bankruptcy court did not find that the Debtors' plan was reasonable as to the degree to which the different management practices would reduce the cattle's winter feed requirements. The court found that there was uncontradicted testimony that the winters on the ranch were sometimes severe and that the feed requirements increase under such conditions. The court stated that the Debtors' plan would not be found feasible unless the Debtors had sufficient funds available in reserve to purchase an additional .8 tons per animal if it was needed. The court arrived at this figure by adjusting the historic two-ton requirement by the amount, as suggested by expert testimony, that spring calving would reduce the winter feed requirement. The court further suggested that without such a

reserve, if the feed is not available when needed, the cows' condition would weaken and the value of the herd would be reduced. Such an occurrence could also impair the security interest of First Security Bank. The dollar amount of the needed feed reserve was calculated at $26,000.00.

The court allowed the Debtors to provide this reserve and the plan was confirmed on February 24, 1997. The confirmed plan included a provision which provided the Debtors with up to $26,000 of credit for winter feed. The winter feed loan would be secured by a 40-acre parcel of land in Montana owned by Jeffery Nauman's parents. The Montana parcel also secures First Security Bank's loan. Overall, the court found that the Debtors' financial projections were achievable. The court indicated at the February 5, 1997, hearing that there were "no guarantees, but there never are in farm cases, and I don't think the law requires there to be a guarantee of success."

■ The Appellants argue, however, that further protections are needed for the possible impact of severe weather on the "ranch operation itself" and possible increases in feed costs. The Debtors respond that the income in excess of projected expenses is devoted to debt service rather than creating a cushion for every contingency. Further, the projected income is considered conservative. Thus, the Debtors argue that the conservative projections create a built-in margin. Although § 1225(a)(6) requires more than a mere possibility of success, § 1225(a)(6) also does not require the plan to be "bomb proof," as the Appellants would apparently hope. The Appellants also claim that the Debtors' plan allows for only a $5,000 margin over four years, although there is no evidence that of the many scenarios presented to the lower court, the exhibit referenced by the Appellants is the Debtors' expected budget. We find that the bankruptcy court did not commit clear error in this regard.

4. **The Appellants argue that there is no allowance for death loss or variance in the cow-calf survivability rate.**

The Debtors have projected a cow-calf survivability rate of 95%. The Appellants consider this unreasonable. Testimony in the bankruptcy court indicated that the Debtors' overall historical survivability rate in the winter months has been 94.7%. The Debtors are also shifting the calving season for their cattle from the historic January–February–March season to May–June. By doing so, the Debtors intend to take advantage of the warmer weather. Testimony in the lower court indicated that calving typically takes place in the earlier months so that the calves weigh more by the fall season, although this approach is less efficient than calving at the later time. Calving at the later time is expected to reduce the need for certain preventive medications, reduce the amount of supplemental cattle feed required to be purchased during the winter months, and increase the survival rate in the herd. Further, the Debtors' cattle nutritional program was designed by two veterinarians, and testimony also suggested that Debtors' cattle survival rate at the feedlot was better than that of some other producers.

The bankruptcy court found that there was contradictory testimony regarding the anticipated survival rate of cattle in the herd. The court found that a number of witnesses had testified on the matter and that the Debtor's projection of a survival rate of 95% was reasonable, given the Debtors' historic performance and the Debtors' plan to shift the calving season to warmer months of the year.

Based on the foregoing, the lower court's determination regarding the feasibility of the Debtors' plan is not clearly erroneous. The lower court was presented with a substantial amount of testimony regarding different aspects of the plan. The testimony was conflicting on some issues, but the record on appeal does not leave a firm and definite conviction that the lower court was mistaken in finding that the plan is feasible. *See In re Arnold and Baker Farms*, 177 B.R. at 653. Therefore, we AFFIRM the bankruptcy court's finding that the plan is feasible.

B. *Permissibility of Negative Amortization*

■ The Appellants argue that the lower court erred in allowing the Debtors' negative

amortization plan. Negative amortization occurs when " 'part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue,' with the accrued interest added to the principal and paid when income is higher." *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1176 (9th Cir.1992) (quoting *In re Club Assocs.*, 107 B.R. 385, 398 (Bankr. N.D.Ga.1989)). "The extent of negative amortization depends upon the difference between the 'accrual rate,' or the overall rate of interest to be paid on a claim, and the 'pay rate,' or the rate of interest to be paid on a monthly basis." *Id.*

As stated above, the original 1995 contract between the Debtors and Miller–Belza for the Ranch Site property required a purchase price of $775,000.00, with a $300,000.00 down payment. The remaining $475,000.00 was to be paid in annual installments with an 8.5% interest rate. The annual installments were to be $50,218.00, with the exception of the first year, in which the payment was to be $42,032.38. The annual payments were to continue until January 3, 2005, when the full balance would be due. The sale contract gave Miller–Belza the right to foreclose on the property in the event of default.

The confirmed plan provided the following payment schedule to Miller–Belza for the Ranch Site property:

| 1997: | $ 8,000.00 |
| 1998: | $39,950.00 |
| 1999: | $63,875.00 |

The plan provides that, effective October 15, 1996, interest on all sums owed to Miller–Belza will accrue at an annual percentage rate of 8.5%. Effective October 15, 1998, the secured claim of Miller–Belza is amortized over an 18–year term at 8.5% annual interest, with annual installments of $63,875.00. The entire balance is due in the year 2005. In the event of default, the plan requires that the property be sold at auction.

The Appellants argue that the Debtors' plan of negative amortization of the ranch property violates several of the factors delineated in *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1177–78 (9th Cir.1992). The bankruptcy court found that the plan met these general requirements. In

*Great Western*, a Chapter 11 case, the Ninth Circuit held that negative amortization was not per se impermissible under the "fair and equitable" requirement of § 1129(b). Rather, the court held that the permissibility of a negative amortization plan under 1129(b) must be decided on a case-by-case basis. *Id.* The *Great Western* court also provided a nonexclusive list of factors relevant to determining whether the negative amortization plan is permissible. These factors are:

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there other adequate safeguards to protect the secured creditor against plan failure.

*Id.* at 1178 (*citing In re Apple Tree Partners*, 131 B.R. 380, 398 (Bankr.W.D.Tenn.1991)). Bankruptcy courts are not required to refer to each of these factors when considering plans that propose negative amortization. *Id.* at 1178. Another court has stated that the main inquiry among these factors is whether the amount and length of the proposed deferral is reasonable. *In re Bowy, Hall and Howard and Assocs.*, 141 B.R. 784, 791 (Bankr.S.D.Ga.1992).

As a technical matter, *Great Western* and all of the other cases cited by the Appellants deal only with the permissibility of negative amortization under the "fair and equitable" requirement of 1129(b). As pointed out by

the Debtors, Chapter 12 has no "fair and equitable" provision corresponding to § 1129(b),[3] and thus *Great Western* is not controlling in this case. Another court has found many of these factors to be an accumulation of some of the requirements of confirmation found in sections 1129 and 1141(b). *In re Bouy*, 141 B.R. at 791. Therefore, Appellants' contention that the bankruptcy court erred by misapplying the *Great Western* factors is technically incorrect. As a Chapter 12 case, the bankruptcy court was under no specific obligation to apply the *Great Western* factors to the Debtors' negative amortization plan.

Although not controlling in this case, the bankruptcy court specifically applied the factors of *Great Western* and found that the negative amortization plan in this case met the *Great Western* requirements. Each of the Appellants' arguments regarding the individual factors is discussed below.

**1. Appellants argue that the second factor is not met in that the amount and length of the interest deferral is unreasonable.**

The bankruptcy court specifically found that the 21–month partial deferral was reasonable given the loan-to-value ratio and the automatic auction sale provisions in the plan. The court found that the loan-to-value ratio was 71% at that time and would reach 75% under the negative amortization plan. Further, the interest rate of 8.5% is the same as that under the Debtors' sale contract, which was entered into only two years before the plan's confirmation. Another court has found a negative amortization rate for the first four years to be acceptable under § 1225(a)(5). *In re Big Hook Land & Cattle Co.*, 81 B.R. 1001, 1006 (Bankr.Mont.1988). The court's finding that this deferral was reasonable was not clearly erroneous.

**2. Appellants argue that the third factor of a satisfactory debt-to-value ratio and the fifth factor of the value of the collateral are not met.**

As stated above, the bankruptcy court found that despite the 21–month partial deferral of interest, the loan-to-value ratio would increase only slightly, from 71% to 75%. Appellants argue that by the time the debt is reamortized in 1998, the Debtors will have approximately $20,000 in equity compared to over $200,000 in equity three years previously. However, as the bankruptcy court explained in its findings, the fact that there is subordinate debt is not relevant to the adequate protection of the Appellants. The Appellants also argue that the Debtors' field management practices create a serious prospect of waste being conducted on the property due to overgrazing. Although some witnesses in the bankruptcy court hearings expressed this concern, there was also ample testimony regarding the successful use of the Debtors' grazing techniques. The bankruptcy court's findings in this regard were supported by evidence and are not clearly in error.

**3. Appellants argue that the plan is not feasible and therefore the fourth factor is not met.**

For the reasons stated above regarding the bankruptcy court's finding that the plan is feasible, the lower court's finding in this regard was not clearly erroneous.

**4. Appellants argue, pursuant to the sixth and seventh factors, that the risks are unduly shifted to the creditor and that the risks are borne by one creditor or a class of creditors.**

The Appellants argue that the plan effectively requires them to loan additional money over the next three years and that they do not have the resources to do so. As stated

---

**3.** Section 1225(a)(5)(B) requires that in the event that the secured creditor does not accept the plan and the debtor does not surrender the property:

the plan provides that the holder of such claim retain the lien securing such claim; and

the value, as of the effective date of the plan, of property to be distributed by the trustee or the

debtor under the plan on account of such claim is not less than the allowed amount of such claim.

The Appellants have not argued that the Debtors' plan does not fulfill the requirements of § 1225(a)(5).

above, the interest deferral period lasts for approximately 21 months. Under the confirmed plan, the full balance on the note remains due at the same time as originally contracted between the parties. There are three secured creditors in this case, Miller–Belza, Mr. Nauman's father, and First Security Bank. Although a negative amortization plan necessarily shifts some additional risk to the creditors, it does not appear that the 21–month deferral plan unduly shifts the burden.

5. **Appellants argue that the eighth and tenth factors, the possibility of foreclosure and adequate safeguards to protect the secured creditor, are also not met.**

The plan does not permit foreclosure, but it does allow an auction in the event of a missed payment. The Appellants argue, however, that the plan does not provide sufficient protection in the first two years since the payments by the Debtors will be minimal at best. Appellants appear to argue that if the Debtors fail in the first year, then there will be insufficient feed for the cattle, overgrazing will occur, and waste will occur on the ranch. Without explanation, the Appellants suggest the need for "adequate remedies" and "greater safeguards" to address these concerns. However, this argument ignores the fact that the bankruptcy court required, as a condition for confirmation, that the Debtors have in place a $26,000 reserve specifically for cattle feed. As such, it does not appear that the bankruptcy court erred in this regard.

Based on the above, we are not left with a firm and definite conviction that the lower court erred in permitting the Debtors' negative amortization plan. Therefore, we **AFFIRM** the bankruptcy court's allowance of the negative amortization plan.

## V. CONCLUSION

Appellants claim that the Debtors' plan is not feasible and the bankruptcy court erred in confirming the plan. However, the bankruptcy court heard conflicting testimony on the many factual issues that compose the overall feasibility of the plan. The bankrupt-

cy court also had the opportunity to assess the credibility of the many witnesses. The factual findings of the bankruptcy court in this regard were not clearly erroneous. The bankruptcy court also found that the negative amortization plan met the general standards of fairness that the Ninth Circuit Court of Appeals has required of such plans under other statutes. Taking all of the bankruptcy court's findings into consideration, this panel is not left with a firm conviction that the court below erred in allowing the negative amortization plan. Therefore, we **AFFIRM** the confirmation order of the bankruptcy court.