**In re Leland Elbert SMITH a/k/a L. Elbert Smith and wife, Frances Jean Smith, Debtors.**

**Bankruptcy No. 586-50696.**

United States Bankruptcy Court, N.D. Texas, Lubbock Division.

Oct. 13, 1987.*

---

* This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 which is made applicable to Contested Matters by Bankruptcy Rule 9014.

Steven Sakonchick, II, Sr. Atty., Federal Land Bank, Austin, Tex., for Bank.

Bruce Magness, Jacobo & Magness, Lubbock, Tex., for debtors.

## MEMORANDUM OF OPINION CONCERNING DEBTORS' CHAPTER 12 PLAN

JOHN C. AKARD, Bankruptcy Judge.

On May 20, 1987 the Court held a hearing to determine if the Debtors' plan proposed under Chapter 12 of the Bankruptcy Code[1] could be confirmed. At the conclusion of the hearing, the Court determined that the Plan could not be confirmed as proposed, but could be confirmed if it were modified in certain respects. The Debtors agreed to those modifications and the Plan, as modified, was confirmed by Order dated June 8, 1987.

The Federal Land Bank (Bank) filed a Notice of Appeal. No other parties have appealed. The Bank and the Debtors submitted proposed Findings of Fact and Conclusions of Law for consideration by this Court. After reviewing the proposed Findings, the Court feels that the matter can be better handled by this Memorandum of Opinion which constitutes Findings of Fact and Conclusions of Law.

A great deal of the Bank's testimony as well as its proposed Findings of Fact related to the structure, method of operation, and cost of operation of the Bank. The

Debtors' proposed Findings responded in like manner, quoting extensively from the Bank's Annual Report which was introduced into evidence. Those matters have no bearing on the issue before the Court. The issue before this Court is: What are reasonable market terms under which the Debtors should pay the secured obligation to the Bank?[2]

Section 1225(a)(5)(B)(ii) provides that creditors are entitled to receive the value of their allowed secured claim, as of the effective date of the Plan, unless the creditor agrees otherwise. If the Plan proposes to pay the secured creditor over time, payments must be discounted to calculate their present value. "Present value is a market rate concept. It is determined by use of an interest rate which properly reflects the cost to the creditor of not receiving the full amount of its secured claim upon confirmation of the debtor's plan. This rate of interest is commonly referred to as a 'discount factor.'" *In re Mitchell*, 39 B.R. 696, 700 (Bankr.D.Or.1984).[3]

The current market rate is the interest rate to be used in computing the present value of the claim. *United States v. Southern States Motor Inns, Inc. (In re Southern States Motor Inns, Inc.)*, 709 F.2d 647, 652–653 (11th Cir.1983). The difficulty in arriving at the market rate of interest and the various methods of determining that rate are discussed in the recent case *In re Doud*, 74 B.R. 865 (Bankr.S.D. Iowa 1987).

The Debtors' Plan proposed to pay the Bank's claim in equal annual installments

---

1. The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to section numbers are to sections in the Bankruptcy Code.

2. The President of the Federal Land Bank of Texas stated that when a person chose to file a bankruptcy proceeding, he violated "the cooperative nature of the relationship between the Bank and that borrower." He stated that "effects of a Chapter 12, if in my opinion, very liberally applied, will make the Federal Land Bank of Texas insolvent." Tr. 58. The Court understands that lenders, in general, are somewhat fearful of Chapter 12. However, the Court feels that these statements are simply "crying wolf." This Court has confirmed a number of

Chapter 12 Plans in which the Bank was a creditor and offered no objection to confirmation. Undoubtedly some of those Plans provided that the terms of repayment to the Bank remained unaltered. Each debtor has different problems and, thus, each Chapter 12 Plan must be viewed with respect to the particular circumstances and problems in that case.

3. *Mitchell* is a Chapter 13 case but the language of § 1325(a)(5)(B)(ii) is the same as that contained in the corresponding section of Chapter 12. The case discusses various interest rates which have been utilized by Courts in arriving at this discount factor.

over a period of 40 years with interest at the rate of 8.5% per annum.[4] The Plan proposed that the Bank be paid only the principal amount owed on December 1, 1986, the date the Debtors filed their Chapter 12 petition. The property on which the Bank has a lien is subject to a second lien in favor of the Farmers Home Administration (FmHA). The Debtors agreed with the FmHA that the remaining value of this land was $26,017.61, establishing the secured amount of the FmHA's claim. The Debtors and the FmHA agreed that this amount would be paid in annual installments over a period of 40 years with interest at the rate of 8% per annum.

Pursuant to its notes with the Debtors, the Bank asserted that it is entitled to a floating interest rate with a minimum of 10.25% payable in annual installments over a period of 10 years. The Bank's attorney acknowledged that these were "old loans" upon which the maximum contract rate is 10% per annum. The Bank asserted that the Debtors' notes are in default; therefore, it has a right to demand whatever terms it wishes.[5]

The Bank's President testified that it would not make a new loan on the terms proposed by the Debtors. Much of the testimony presented by the Bank related to criteria for new loans. However, in the instant case, we are not looking at a new loan, but at a workout situation designed to allow the Debtors to rehabilitate themselves and to pay their secured obligations over a period of time at market rates of interest.[6] The Bankruptcy Code nowhere directs the Court to consider the operating costs of a lender when establishing the interest rate to be charged to a borrower. The Bank, like all other lenders, must take steps to reduce its cost of funds (there was testimony that it attempted to do so) and must take appropriate action to reduce its overhead in order to meet current market conditions.

 The Bank, as a secured creditor whose collateral exceeded the amount of its debt, is entitled to postpetition interest under § 506. The Court, therefore, concluded that the Bank was entitled to interest at the maximum contract rate of 10% per annum to the date of the Confirmation Hearing, May 20, 1987. The principal and interest owed the Bank on May 20, 1987 then become the principal amount to be paid to the Bank under the terms of the Debtors' Plan.

 Based on the testimony presented at hearing, the Court concluded that 9.5% per annum would be a reasonable market rate of interest to be paid the Bank on its secured obligation.[7] Additionally, the Court

---

4. The Bank's claim is composed of three notes: Note # 401958 dated April 23, 1973 in the original principal amount of $45,000.00 upon which the balance due on December 1, 1986 (the date this Chapter 12 Petition was filed) was $28,948.40; Note # 410128 dated August 20, 1975 in the original principal amount of $57,000.00 upon which the balance is $48,485.82; and Note # 414664 in the original principal amount of $58,300.00 dated February 8, 1977 upon which the balance is $53,033.69. Thus the Debtors' total obligation to the Bank on December 1, 1986 was $130,467.91. The Debtors' Amended Chapter 12 Plan dated May 29, 1987 lists the Bank's claim at $136,550.38 which presumably includes interest from December 1, 1986. The Plan recognizes the separate notes and liens maintained by the Bank.

5. The Bank also asserted that this interest is necessary to cover the Bank's cost of funds and operating expenses. In making these calculations, however, the Bank chose to ignore a current, widely advertised program being offered by the Bank (a copy of the advertisement was admitted into evidence) wherein the Bank agreed to make new loans at 8.7% to 9.5%. The Bank asserted that it received "special funds" for the purpose of making these lower interest rate notes. Certainly the Bank cannot be criticized for trying to make loans at competitive rates, but these rates indicate that the Bank attempted to have the Court accept as operating costs something less than the full picture.

6. "In any bankruptcy case there are seldom any winners, just survivors." *In re Nite Lite Inns,* 17 B.R. 367, 373 (Bankr.S.D.Cal.1982).

7. The Court is concerned that allowing the Bank 9.5% interest on its first lien creates an "upside-down" situation. Typically the first lien bears a lower interest rate than the second lien. In this instance, the FmHA agreed to an 8% interest rate on its second lien. This Court has confirmed a number of Chapter 12 Plans wherein various lenders secured by first liens on real estate agreed to interest rates of between 8% and 9%. It is possible the Court's analysis of the market on May 20, 1987 was too high.

concluded that the market supported a 30–year amortization on first-lien agricultural land notes. Debtors need a long term pay-out schedule in order to effectuate their Chapter 12 Plan and to continue to operate on a profitable basis after payments to the unsecured creditors. The 30–year, fixed-rate amortization gives the debtor a definite basis on which he can plan his farm operations. This stability is necessary for the farmer to reorganize successfully.

In an attempt to meet some of the objections raised by the Bank, the Court placed two limitations on the Debtors' obligation to the Federal Land Bank:

a. First, if the Debtors sell the property or lease it for a term longer than three years, the balance to the Bank becomes due. In the event of a sale, or a lease of that nature, the Debtors will no longer be engaged in farming and the necessity for the reasonable fixed annual payment will no longer exist.

b. The remaining principal and interest on the note will become due 20 years from the date of the Confirmation Hearing. The Bank did not want to make a 30–year loan and the purpose of this provision is to accommodate the Bank in that regard. The Court feels that by the expiration of 20 years, the Debtors should be able to pay off or refinance the balance due the Bank. It will take the Debtors several years to get on their feet financially and to make the payments to the unsecured creditors under the Plan. The Court hopes that once all payments to the unsecured creditors are made, the Debtors will make additional payments to the Bank, thereby reducing the Debtors' overall interest cost and, hopefully, paying the Bank in full within 20 years from the date of confirmation.