**In re Reson Lee WOODS, also known as Lee Woods, doing business as Bar LS Farms, formerly doing business as Bar LS Properties Inc., and Shaun K. Woods, also known as Shaun Woods, doing business as Bar LS Farms, formerly doing business as Bar LS Properties Inc., Debtors.**

**First National Bank of Durango, Appellant,**

v.

**Reson Lee Woods and Shaun K. Woods, Appellees.**

BAP No. CO–11–083.
Bankruptcy No. 10–38344.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Feb. 27, 2012.

Submitted on the briefs: *

Garry A. Appel of Appel & Lucas, P.C., Denver, CO, and Shay L. Denning of Maynes, Bradford, Shipps & Sheftel, LLP, Durango, CO, for Appellant.

Cheryl A. Thompson of Thompson Brownlee, L.L.C., Frisco, CO, and Daniel

---

\* The parties did not request oral argument, and after examining the briefs and appellate record, the Court has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. Bankr.P. 8012. The case is therefore ordered submitted without oral argument.

J. Lowenberg of Mountain Law Group, L.L.C., Montrose, CO, for Appellees.

Before CORNISH, MICHAEL, and NUGENT, Bankruptcy Judges.

NUGENT, Bankruptcy Judge.

First National Bank of Durango (the "Bank") appeals a bankruptcy court order confirming Reson Lee Woods and Shaun K. Woods' Corrected Amended Chapter 12 Plan. The Bank argues that the bankruptcy court erred when it found that the Woods were family farmers, when it confirmed their proposed treatment of its secured claims, and when it denied the Bank's application to add some of its attorneys' fees and costs to its claim. After careful consideration of these issues, we AFFIRM.

## I. Factual Background

The Woods have farmed hay and raised and boarded horses near Ignacio, Colorado since 1999. Before that, they ranched and sold real estate in Florida. In 2007, they purchased the tract of farm land that presently secures the Bank's claim with a purchase money mortgage loan from Pine River Valley Bank. By the time they decided to build their home on that tract in 2008, their lending officer had gone to work in Durango for the Bank. He referred them to another officer who proposed to make a construction loan for the house and told the Woods that, barring changed circumstances, the Bank would make them a permanent loan when construction was complete. On April 15, 2008, the parties executed a Construction Loan Agreement, and the Woods signed a promissory note in the amount of $480,000.00 with a maturity date of October 15, 2009.[1] Approximately $284,000.00 of that loan was used to pay off the Pine River purchase money loan.[2] When it made the construction loan, the Bank also approved the Woods for a $482,000.00 permanent loan that would bear interest at an adjustable rate, be amortized over thirty years, and be payable with a balloon payment due in five years.[3]

But when the home was completed in 2009, the Bank balked. A dispute over whether the Bank had actually committed to the permanent financing developed, but appeared resolved in the fall of 2009 when the Bank proposed to lend the Woods enough to pay off the construction loan at 5.25% interest per annum, to be repaid in monthly payments amortized over thirty years with a balloon payment of all remaining principal and interest due in seven years. Before this loan could close, the Bank balked again, tendering a series of progressively less favorable loan proposals to the Woods. The Bank blamed its hesitancy on the Woods' alleged lack of creditworthiness. Eventually the Woods sued the Bank in state court and the Bank foreclosed the construction mortgage. The looming sale of the house and land prompted the Woods to file their Chapter 12 case.

The Woods live on the farm at Ignacio (the "Property"). They raise hay and board horses there. They rent other hay ground. Their office and farm headquar-

---

1. Promissory Note and Construction Loan Agreement, *in* Appellant's Appendix ("App.") at 85–93.

2. Hearing Transcript ("Tr.") of May 6, 2011, Testimony of Reson Woods at 52, ll. 9–12, *in* App. at 287.

3. Credit Approval Memorandum dated Apr. 8, 2008, *in* Supplemental Appendix of Appellees Reson Lee and Shaun K. Woods ("Supp. App.") at 31.

ters are located in the home built with the proceeds of the Bank's loan. If the Bank's principal and interest claim of approximately $503,000 (without the attorneys' fees) is included in their farm debts, over half their debt is attributable to farming.

The Woods initially proposed a plan that provided for the Bank to be repaid at 5% fixed interest in monthly payments amortized over forty years and payable in full in twenty years. After the first confirmation hearing in May of 2011, the bankruptcy court sustained the Bank's objection to that treatment, not least because the Woods' plan did not specify that the Bank would retain its lien, but overruled its other objections.[4] The Woods filed an Amended Plan, followed by a Corrected Amended Plan that proposed the same treatment that the Bank had offered in 2009, with the added feature that they would receive a forty-day grace period for payments twice a year. After a further confirmation hearing in August of 2011, the bankruptcy court confirmed the Corrected Amended Plan (the "Plan"), but struck the forty-day grace provision.

Based upon the detailed cash flow information and three-year income projection that the Woods and their farm financial expert witness presented, the bankruptcy court found that the Woods could make the payments they proposed. After hearing the testimony of the Woods' and the Bank's appraisers, the bankruptcy court concluded that the Woods' land and water rights were worth $750,000. At the August hearing, for the first time, the Bank asked for additional attorneys' fees and expenses that would have increased its allowed claim by more than $78,000. The Bank asserted that it had incurred these fees and expenses in enforcing its claim in bankruptcy, but the bankruptcy court did not allow this portion of the Bank's claim because the Bank "presented no evidence as to the makeup [and] reasonableness of these collection costs and expenses."[5] After the bankruptcy court issued its order on August 22, 2011, the Bank appealed.

## II. Appellate Jurisdiction and Standards of Review

We have jurisdiction of this appeal.[6] The Bank raises a number of issues, but we focus on these. We consider whether the Woods are "family farmers" as defined in § 101(18); whether their proposed treatment of the Bank's claim comports with the standards of § 1225(a)(5)(B)(ii); whether their plan is feasible; and whether the Bank should have been granted its attorneys' fees. We review factual findings for clear error and legal conclusions *de novo.*[7] Matters of discretion are reviewed for abuse of discretion.[8]

---

4. These included objections to the debtors' good faith and the feasibility of the debtors' plan. As it was not briefed on appeal, the good faith objection has been abandoned.

5. Aug. 22, 2011, Oral Ruling Tr. at 316, *ll.* 24–25, *in* App. at 1265.

6. The Bank timely filed its notice of appeal from the bankruptcy court's final order and the parties have consented to this Court's jurisdiction because they have not elected to have the appeal heard by the United States District Court for the District of Colorado.

*See* 28 U.S.C. § 158(b); Fed. R. Bankr.P. 8001(e); Fed. R. Bankr.P. 8002(a); *In re Wade,* 991 F.2d 402, 406 (7th Cir.1993) (confirmation of a bankruptcy plan is a final, appealable order).

7. *Pierce v. Underwood,* 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *see* Fed. R. Bankr.P. 8013; *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1370 (10th Cir. 1996).

8. *Pierce* at 558, 108 S.Ct. 2541.

■ With these familiar tools at hand, we review the bankruptcy court's interpretation of § 101(18) afresh, as we do its interpretation and application of § 1225(a)(5).[9] The bankruptcy court's findings of fact that relate to the role of the Woods' home in their operation, their means of making their plan payments, and the determination of an appropriate discount rate are afforded substantial deference and are reviewed for clear error.[10] The bankruptcy court's approval of the term of repayment of the Bank's claim and its evidentiary rulings are matters of discretion.[11] Finally, the bankruptcy court's attorneys' fees rulings are reviewed *de novo*.[12]

## III. Discussion

### A. The Bank's loan "arises out of a farming operation" and must be counted as farm debt.

■ Only family farmers or fishermen may seek Chapter 12 relief. Section 101(18)(A) defines a "family farmer" as (1) an individual engaged in farming; (2) who has aggregate debt less than $3.792 million; (3) whose debt consists of more than 50 percent of debt arising out of his farming operation "excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation;" and (4) who received more than 50 percent of his income from farming in the taxable year preceding the year of the petition's filing.[13] The bankruptcy court held that

9. *See Watford v. Fed. Land Bank of Columbia (In re Watford)*, 898 F.2d 1525, 1527 (11th Cir.1990) (Whether a particular activity conducted by Chapter 12 debtors constitutes a "farming operation" is a legal question subject to *de novo* review, but issue of whether debtor was engaged in that particular activity is a factual one reviewed for clear error.); *In re Yett*, 306 B.R. 287, 290 (9th Cir. BAP 2004) (the determination of factors to apply in valuation calculation under § 1225 involves an interpretation of statute that is reviewed *de novo*, while the application of those factors to a particular case is a question of fact reviewed for clear error, giving substantial deference to the bankruptcy court in making cramdown interest rate determinations).

10. *In re Nauman*, 213 B.R. 355, 358 (9th Cir. BAP 1997) (Whether proposed Chapter 12 plan is sufficiently "feasible" to be confirmed is factual determination reviewed for clear error.); *In re Inv. Co. of the Sw., Inc.*, 341 B.R. 298, 310 (10th Cir. BAP 2006) (a bankruptcy court's determination of whether Chapter 11 plan is feasible is reviewed for clear error); *In re Fowler*, 903 F.2d 694, 696 (9th Cir.1990) (a bankruptcy court should be accorded substantial deference in making cramdown interest rate determinations).

11. *In re John Francks Turkey Co., Inc.*, UT–98–066, 1999 WL 565883, at *2 (10th Cir. BAP Aug.2, 1999) (finding no abuse of discretion in the bankruptcy court's determination of the appropriate amortization period and

length of the repayment terms); *U.S. v. McIntosh*, 124 F.3d 1330, 1338 (10th Cir.1997) (court's admission of evidence reviewed for abuse of discretion).

12. *In re Sun 'N Fun Waterpark LLC*, 408 B.R. 361, 366 (10th Cir. BAP 2009) (conclusion regarding allowance of attorneys' fees reviewed *de novo*); *Kittel v. First Union Nat'l Bank (In re Kittel)*, WO–01–094, 2002 WL 924619 (10th Cir. BAP May 8, 2002) (findings regarding amount of attorneys' fees and expenses reviewed for clear error, but conclusion concerning the allowance of fees are reviewed *de novo*).

13. 11 U.S.C. § 101(18)(A). This section defines "family farmer" as:

[an] individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $3,544,525 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (*excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation*), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for—

(i) the taxable year preceding; or

the Bank's claim arose from the Woods' farming operation even though it is secured by their homestead. The court concluded that the debtors proved their house is an integral part of their operation. The Bank objected to the inclusion of the construction portion of the loan as part of the debt that arose from the operation because § 101(18)(A) requires exclusion of a debt incurred solely to build the farmer's residence from the calculation. Were the construction portion of the Bank's loan to be excluded, the Woods would not qualify as family farmers because less than 50% of their debt would arise from their farming operation. The bankruptcy court was correct.

Section 101(18)(A) excludes a "debt for the principal residence" of the family farmer unless such debt arises out of a farming operation. According to the Bank, the fact that the debtors' farming operation predated the house proves that the house is not integral to the farming operation. We disagree. The fact that the Woods farmed the tract before building their home does not mean that the cost of constructing it did not "arise out of a farming operation."

Few courts have considered when a debt "arises out of a farming operation." [14] The majority of those that have focused on the purpose of the debt—whether it was incurred and the proceeds used for the farming operation. [15] The Bank urges us to adopt a but-for test that only recognizes as farm debt those loans or other credits without which there would be no farming operation. We think the better approach is found in *In re Saunders*, where the court concluded that "to 'arise out of a farming operation' the purpose of a debt must have some connection to the debtor's farming activity." [16] This broader test is more consistent with the plain language of § 101(18)(a). Even the cases that espouse the but-for approach focus on whether the questioned debt is "interwoven with" or "related to" the farming operation. [17] We suggest that the residential exclusion, like the income requirement, was aimed at preventing debtors from avoiding the more onerous limitations on restructuring residential debt found in other chapters by relying on a "hobby farm," rather than at actual farmers who live on their farms.

The bankruptcy court found that the Woods' farmhouse was an integral part of the farm operation because the farm's books, and records are maintained in an office there and the farmhouse's proximity

---

(ii) each of the 2d and 3d taxable years preceding[.]
*Id.* (emphasis added).

14. This Court found no case specifically addressing whether construction financing for a debtor's residence on a farm is a debt that "arises out of a farming operation."

15. *In re Saunders*, 377 B.R. 772, 774 (Bankr. M.D.Ga.2007).

16. *Id.* at 776 and 774–76 (examining *In re Kan Corp.*, 101 B.R. 726, 727 (Bankr. W.D.Okla.1988) (For a debt incurred as a result of loan to "arise out of a farming operations," the proceeds of the loan must in some way be directly applied to or utilized in the farming operations.); *In re Easton*, 883 F.2d 630, 636 (8th Cir.1989); *In re Marlatt*, 116 B.R. 703, 705 (Bankr.D.Neb.1990) (for a debt to arise out of a farming operation, there must be a connection between the debt and the debtor's farming activity); *In re Douglass*, 77 B.R. 714, 715 (Bankr.W.D.Mo.1987) (it is (or should be) the reason or purpose for which the debt was incurred coupled with the use to which the borrowed funds were put that should be the criteria to determine whether the debt arises out of a farming operation); *In re Rinker*, 75 B.R. 65, 68 (Bankr. S.D.Iowa 1987); *In re Roberts*, 78 B.R. 536, 537–38 (Bankr.C.D.Ill.1987), *In re Reak*, 92 B.R. 804, 806 (Bankr.E.D.Wis.1988) (describing the test applied in *Roberts* and *Rinker* as a "but for" test)). *See also In re Teolis*, 419 B.R. 151 (Bankr.D.R.I.2009).

17. *See Reak*, 92 B.R. at 805–06.

to the rest of the operation allowed the Woods to take care of their livestock and irrigation system. Ample evidence supports these findings.[18] Because the farmhouse is connected to the Woods' farming activities, including the construction portion of the loan in the farm debt calculation was proper.

### B. The Woods' treatment of the Bank's claim meets the requirements of § 1225(a)(5).

Section 1225(a)(5) sets out the requirements for confirming a debtor's proposed treatment of an allowed secured claim. When the creditor objects to that treatment, the debtor must show that the creditor will retain its lien in the security and receive property, usually payments, with a value that is equal to the amount of the creditor's allowed secured claim on the effective date of the plan. This requires the bankruptcy court to determine the amount of the creditor's allowed secured claim and whether the proposed payment stream has a present value that is equal to the allowed secured claim.

1. *The Bank's claim is fully secured in the amount of $503,045.76 plus interest accruing up to the value of the Bank's security, or $750,000.*

■ The parties do not dispute the bankruptcy court's finding that the Bank's claim, including accrued interest and costs, but excluding some of the Bank's attorneys' fees, is $503,045.76, subject to the further accrual of interest. The Bank challenges the bankruptcy court's conclusion that the tract and the house are worth $750,000 because the Bank's appraiser val-

ued it at $600,000. The Bank argues that the bankruptcy court was influenced by two earlier appraisals found in the Bank's file which were admitted in the Woods' case over the Bank's objection. Section 506(a) provides that a secured claim shall be allowed to the extent of the value of the collateral that secures it. In this case, the Bank's secured claim should be allowed in full because the value of the land and farmhouse, whether it is $600,000 or $750,000, exceeds the amount the Bank is owed. Accordingly, § 506(b) permits the Bank to collect accruing postpetition interest and, to the extent properly proven, attorneys' fees and expenses, up to $750,000.

■■ We see no reason to assign clear error to the bankruptcy court's value findings. Nor do we see that the Bank's evidentiary objection matters. Even if it did, the Bank's argument that these prepetition appraisals are not admissible under Rule 702 of the Federal Rules of Evidence fails because the bankruptcy court admitted these pre-petition appraisals not as expert evidence, but as party opponent admissions under Rule 801(d)(2)(D). The bankruptcy court admitted these exhibits, contained in the Bank's file, as admissions by the Bank of the value of the Property on each reports' respective date for the purpose of impeaching the Bank's appraiser's valuation of the Property as of the petition date.[19] Federal Rule of Evidence 801(d)(2)(D) excludes from the definition of hearsay an admission by a party opponent that is a statement made by an agent or servant concerning a matter within the scope of the agency and made during the

---

**18.** Tr. of May 6, 2011, Testimony of Reson Woods at 53–54, *ll.* 17–25, 1–18, *in* App. at 288–89.

**19.** Tr. of Aug. 8, 2011, Hearing at 248, *ll.* 7–19, *in* App. at 1122 ("I have heard the bank's counsel stipulate that [these appraisals are a] part of the bank's file ... [they're] offered as an admission of the bank's agent as to value. And I will admit [ ] the appraisals [ ] from the bank's file [ ] for the purpose of [ ] impeaching [John Dustin's value of the Property].").

existence of the relationship. Because these pre-petition appraisals meet Rule 801(d)(2)(D), we cannot say the decision to admit them was an abuse of discretion.[20] Even if it was, the error was harmless because there was ample additional evidence to support the bankruptcy court's factual finding that the Property was worth $750,000.[21]

2. *The proposed interest rate is sufficient to return to the Bank the value of its allowed secured claim as § 1225(a)(5) requires.*

Relying on the Supreme Court's plurality opinion in *Till v. SCS Credit Corp.*,[22] the Bank objected that the proposed discount rate did not reflect the market rate for like loans, nor did it include sufficient compensation for the risk to which the Bank was subjected under the Plan. For those reasons, the Bank argued that the Woods' plan did not provide for the distribution of property having a value equal to the allowed amount of the Bank's claim as of the effective date of the plan as § 1225(a)(5)(B)(ii) requires.[23] But the bankruptcy court held that because the Bank had proposed very similar terms in 2009 and the Woods had accepted them, this rate amounted to a contract rate that sufficed under Tenth Circuit authority in *In re Hardzog.*[24] The bankruptcy court pointed out that this loan was a "hybrid"— neither a conventional home mortgage nor a conventional agribusiness loan that might be secured by land, equipment, livestock, or crops. Although the bankruptcy court declined to decide whether *Till* trumps *Hardzog*, we conclude that *Till's* formula-based approach applies in Chapter 12 and we find no clear error in the bankruptcy court's conclusion that an appropriate risk factor in this case is 200 basis points plus the then-applicable prime rate of 3.25%, or 5.25%.

In *Hardzog*, the Tenth Circuit reversed a bankruptcy court's holding that a Chapter 12 debtor need only pay a discount rate based upon the lender's cost of funds. As in this case, the Hardzogs' farm ground was worth more than they owed their lender. The bankruptcy court had determined what it cost the lender to obtain money to lend, enhanced that by a risk factor, and concluded that, rather than the contract rate of 12.5%, the lender was only entitled to collect 10% interest. The Tenth Circuit specifically concluded that "[a] 'cost of funds' approach is not susceptible of accurate determination without complex problems of proof and may not result in fairness."[25] Commenting that judges are "neither bankers nor lenders and do not have the expertise to set interest rates," the Circuit noted that lenders consider what the competition charges in the market, the economic conditions, the collateral's value, and other factors in setting an appropriate rate.[26] In other words, the *Hardzog* court embraced the "market rate" approach and held that "in the absence of special circumstances, such as the market rate being higher than the contract

**20.** *See Wright–Simmons v. City of Okla. City,* 155 F.3d 1264, 1268 (10th Cir.1998); *In re Shapiro,* 109 B.R. 127, 135 (Bankr.E.D.Pa. 1990) (previous appraisals are in the form of an admission).

**21.** Tr. of Aug. 8, 2011, Testimony of Larry Ashcraft at 54–55, *in* App. at 928–29.

**22.** *Till v. SCS Credit Corp.,* 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004).

**23.** *See* 11 U.S.C. § 1225(a)(5)(B)(ii).

**24.** 901 F.2d 858 (10th Cir.1990).

**25.** *Id.* at 860.

**26.** *Id.*

rate, Bankruptcy Courts should use the current market rate of interest used for similar loans in the region." [27] The court suggested that this rate would be "easily susceptible" of determination after a hearing where each side could produce evidence of the current loan market. The court supported its conclusion with the comment that a Chapter 12 plan treatment is similar to a new loan to the debtor that should bear interest at a rate similar loans in the market would bear. Thus, for many years, courts in this Circuit have applied the "market rate" approach unless the parties had agreed on a lower contract rate before the petition date.

■ In 2004, the United States Supreme Court entered the interest rate discussion with *Till*.[28] In a split decision, the high court held that a secured creditor in a Chapter 13 case was entitled to receive a discount rate equal to the national prime rate plus a risk adjustment—a formula-based approach. Section 1325(a)(5) is virtually identical in language to § 1225(a)(5), making *Till's* reasoning applicable here. Our review of *Till* convinces us that it effectively overrules *Hardzog* and that the formulaic approach must be taken in evaluating whether a secured creditor's treatment in a Chapter 12 plan complies with § 1225(a)(5)(B) and should be confirmed.[29]

In *Till*, three justices joined Justice Stevens' opinion that rejected the use of

"coerced loan, presumptive contract rate, and cost of funds approaches." [30] Concluding that each of these approaches "is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value," [31] Justice Stevens preferred beginning with the national prime rate that is widely reported and enhancing it with a risk factor. His opinion noted that the prime rate reflects the financial market's estimate of what a commercial bank should charge a creditworthy borrower to compensate for opportunity costs, inflation risk, and a slight risk of default.[32] Debtors posing a greater default risk should pay a higher rate that is adjusted for "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." [33] The four justices stated that unlike the other approaches, "the formula approach entails a straightforward, familiar, and objective inquiry" that "depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." [34] A fifth justice, Justice Thomas, concurred in the judgment. In a separate opinion, he questioned whether there was any statutory justification for any risk adjustment, but he concluded that because the rate allowed by the four-justice plurali-

27. *Id.*

28. *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004).

29. A number of bankruptcy courts have applied *Till's* rate in Chapter 12 cases. *In re Toso*, No. EC–05–1290–PaBuMo, 2007 WL 7540985 (9th Cir. BAP Jan.10, 2007); *In re Hudson*, Case No. 208–09480, 2011 WL 1004630 (Bankr.M.D.Tenn. Mar. 16, 2011); *In re Tamcke*, Case No. 09–60833–12, 2010 WL 231751 (Bankr.D.Mont. Jan. 14, 2010); *In re Schreiner*, Case No. BK09–41014–TLS,

2009 WL 924418 (Bankr.D.Neb. Mar. 30, 2009); *In re Torelli*, 338 B.R. 390 (Bankr. E.D.Ark.2006).

30. *Till*, 541 U.S. at 477, 124 S.Ct. 1951.

31. *Id.*

32. *Id.* at 479, 124 S.Ct. 1951.

33. *Id.*

34. *Id.*

ty opinion was higher than the risk-free prime rate, the creditor was receiving the requisite present value to satisfy § 1325(a)(5).[35]

Since the plurality opinion in *Till* expressly disavows the market rate approach adopted by *Hardzog*, we conclude that *Hardzog* has been overruled by *Till* and that the *Till* rate should be applied in Chapter 12 cases.[36] That leaves us to consider the record and ruling on this issue in *Till's* light. There was no dispute at trial that the prime rate as of the hearing date was 3.25%, but there was differing testimony about risk. The Woods' expert witness, a university professor who specializes in agricultural finance, testified that he had reviewed Federal Reserve data that suggested that farmland loans were typically drawing between 4.7% and 5.1% interest.[37] He also noted that farmland prices had continually risen in Colorado for several years. He concluded that a mortgage of 5% for a twenty to thirty-year duration, amortized over thirty years, was within the range of prevailing rates for similar loans in the region.[38] He testified that he himself had received a 6% twenty-year loan only the prior year from a rural Colorado bank.[39]

The Bank's president testified that the Bank only offered loans like this at 6 to 6.5%, fixed for five years.[40] Longer-term loans would only be made if they could be sold into the secondary mortgage market and those loans were capped at $127,000.[41] The best fixed rate available at his bank to a borrower like the Woods would be between 6.5 and 7%.[42] He stated that, based on the Bank's assessment of the Woods' payment performance, collateral, and volatility of income stream, he would adjust for risk in this case by adding as much as 3 to 4% to the prime rate for a range of 6.25 to 7.25%.[43] The Bank's expert, a loan officer for Janus Mortgage, stated that he originated loans for Farmer Mac, a government corporation analogous to Freddie Mac, that funds the secondary market for agricultural loans. He testified that he would only make a loan of the sort proposed here for 13 or 14% and that the market would not support the 5.25% rate proposed by the Woods.[44]

■ Although the bankruptcy court did not specifically assess and apply the *Till* factors to this case, it did conclude that a risk adjustment of 2% was appropriate. The evidence supports that conclusion. The evidence that loans at rates between 4.7 and 5.1% were available in the current market, that farmland prices were rising, that the Woods' plan was feasible, and that the plan proposed a seven-year payout comprised sufficient proof that "the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan" warranted a

---

**35.** *Id.* at 490–91, 124 S.Ct. 1951.

**36.** This decision is expressly limited to Chapter 12 cases. The issue of whether *Till's* formula approach should apply in Chapter 11 cases is not before us and need not be decided here.

**37.** Tr. of May 10, 2011, Testimony of Norman Dalsted at 270, *ll.* 15–20, *in* App. at 561.

**38.** *Id.* at 271–72, *in* App. at 562–63.

**39.** *Id.* at 297, *ll.* 3–24, *in* App. at 588.

**40.** Tr. of Aug. 8, 2011, Testimony of Mark Daigle at 158–59, *in* App. at 1032–33.

**41.** *Id.* at 159–60, *in* App. at 1033–34.

**42.** *Id.* at 161, *ll.* 12–24, *in* App. at 1035.

**43.** *Id.* at 161–64, *in* App. at 1035–38.

**44.** Tr. of Aug. 8, 2011, Testimony of Robert Larson at 195–97, *in* App. at 1070–71.

risk adjustment of 2% over the prime rate of 3.25%.[45] Most of this evidence came from the Woods' expert witness who specifically discussed the financial and land markets, the plan's feasibility, and the loan's characteristics. The Bank's witnesses addressed these topics too, but the bankruptcy court preferred the Woods' evidence over the Bank's, and because the bankruptcy judge heard the evidence, we defer to his assessment of its quality and weight. We cannot say that his conclusion approaches clear error when it is supported by evidence in the record.

Even if *Hardzog* were to survive and be applied here, the result is the same. The record contains evidence that market rates for loans similar to this one range from 4.7% to as much as 7%. And, the loan terms proposed by the Woods precisely mirrored those that the Bank offered them and which they accepted in 2009. While this may not demonstrate the existence of a "contract rate" that triggers the special circumstance exception to the *Hardzog* rule, there was plenty of evidence to support a finding that the plan proposed a rate that was within market parameters. The bankruptcy court's interest rate conclusion should therefore be affirmed.

### 3. *The loan term is appropriate and may be confirmed.*

In Chapter 12 cases, bankruptcy courts can modify the rights of secured creditors and extend the repayment period for secured claims beyond the life of the plan when appropriate.[46] Section 1225 does not specifically address the length of the repayment term that must be provided under the plan. The Bank's objection rests on the supposed lack of evidence that a seven-year repayment period was either currently available in the market or consistent with current market terms. Yet the market is not the only means by which the bankruptcy court determines the appropriate period of time over which a claim may be paid.

Courts addressing permissible repayment terms for secured creditors have generally been lenient in allowing debtors the maximum time to pay their claims.[47] *Collier's* comments that "[t]he primary consideration in analyzing the appropriate term for payment of a secured claim is the type of property securing the claim."[48] Courts also consider whether the particular length of time proposed by the debtor is appropriate under the circumstances.[49] Many courts have approved plans that amortize claims using a lengthy period, but require a balloon payment in a shorter time.[50] When contemplating a

**45.** *See Till*, 541 U.S. 465, 480, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) (noting other courts have generally approved adjustments of 1 to 3%).

**46.** 11 U.S.C. § 1222(b)(2) and (b)(9).

**47.** *In re John V. Francks Turkey Co., Inc.*, UT-98–066, 1999 WL 565993, at *2 (10th Cir. BAP Aug. 2, 1999); 8 *Collier on Bankruptcy* ¶ 1225.03[4][b], at 1225–16 (Alan N. Resnick & Henry J. Sommer eds, 16th ed. 2010).

**48.** 8 *Collier on Bankruptcy* ¶ 1225.03[4][b], at 1225–16.

**49.** *Id.*

**50.** *Id.* at ¶ 1225.03[4][b][I], at 1225–17 (citing *In re Schreiner*, Case No. BK09–41014–TLS, 2009 WL 924418 (Bankr.D.Neb. Mar. 30, 2009) (20–year amortization with a 5–year balloon); *In re Torelli*, 338 B.R. 390 (Bankr. E.D.Ark.2006) (10–year amortization with a 5–year balloon); *In re Lockard*, 234 B.R. 484 (Bankr.W.D.Mo.1999) (20–year amortization with a 5–year balloon); *In re LLL Farms*, 111 B.R. 1016 (Bankr.M.D.Ga.1990) (30–year amortization with a 20–year balloon); *In re Foster*, 79 B.R. 906 (Bankr.D.Mont.1987) (30–year amortization with a 15–year balloon); *In re Smith*, 78 B.R. 491 (Bankr.N.D.Tex.1987) (30–year amortization with a 20–year balloon)).

plan's repayment period, a court may consider the length of the underlying note and the creditor's customary repayment periods for similar loans.[51]

■ In this case, the Bank's loan is secured by real estate. Real estate loans often have thirty year terms as evidence by Woods' expert's testimony that the typical amortization period on loans secured by real estate was between fifteen and thirty years.[52] The Woods intended to repay or refinance the Bank's claim in seven years. That and the fact that the Bank previously offered a thirty-year amortization with a balloon payment in seven years suggest that the seven-year repayment period was appropriate. Allowing the seven-year repayment term was well within the bounds of permissible choice and was not an abuse of the bankruptcy court's discretion.

### C. There is no clear error in the finding that the debtors' plan is feasible.

■ Section 1225(a)(6) requires a Chapter 12 debtor to demonstrate at confirmation that he "will be able to make all payments under the plan and to comply with the plan." The Woods showed that their cash flow would be positive and that their reserves would increase over the first three years, but the Bank argues that they offered no evidence to demonstrate that they could make the monthly payments in years four through seven of the Plan or the balloon payment in the seventh year. Debtors are required only to provide reasonable assurance, not a guarantee, that they will succeed under the plan. There

was sufficient evidence in the record here to support the bankruptcy court's conclusion that the debtors would be able to make all their payments and comply with the Plan.

Under their plan, the Woods proposed to make seven years of monthly payments and to pay the remaining principal and interest due on the claim at the end of the seventh year. Based on the Woods' cash flow projections, the bankruptcy court found that the Woods had "the capacity to service the Bank's restructured loan, meet operating and living expenses, and maintain a sufficiently viable operation to make the seven year balloon payment from operating revenues, refinancing, sale of assets, or some combination of these [and that they] will be able to make the payments under the plan."[53] The Bank argues that because the cash flows only extend for three years, the bankruptcy court was wrong to conclude that the debtors could make the monthly payments beyond the first three years. We disagree.

■ A plan's feasibility is a fact-sensitive question. We review the bankruptcy court's findings for clear error.[54] To demonstrate feasibility, a debtor must provide reasonable assurances the plan can be achieved, not guarantee its success.[55] Cash flow projections are exactly that—projections. Courts examine whether they are based on valid assumptions to determine the likelihood that they will prove true. Questions about plan feasibility are resolved by giving the debtor the benefit of the doubt when the projections warrant it.[56]

**51.** *In re Torelli,* 338 B.R. at 397.

**52.** Tr. of May 10, 2011, Testimony of Norman Dalsted at 270, *ll.* 9–12, *in* App. at 561.

**53.** Tr. of Aug. 22, 2011, Oral Ruling at 320, *ll.* 6–12, *in* App. at 1269.

**54.** *In re Nauman,* 213 B.R. 355, 358 (9th Cir. BAP 1997).

**55.** *In re Ames,* 973 F.2d 849, 851 (10th Cir. 1992).

The Woods' projections showed steadily increasing cash flow each year ($76,419, $134,982, and $171,808) and projected excess cash of over $171,000 by the end of 2013.[57] Mr. Dalsted, the Woods' expert on agricultural economy and farm and ranch management, testified that:

> [A]nd my opinion is that this a very doable plan. These farmers have developed a very unique niche market that has only the potential to grow. And they have adequate funds in terms of revenue coming in. And I think they've been very reasonable in estimating what their expenses are.[58]

The bankruptcy court heard extensive evidence about the projections and accepted Dalsted's conclusions.

Likewise, the record supports the bankruptcy court's conclusion that the Woods would be able to make the balloon payment due in seven years. Mr. Woods testified that he intended to continue farming operations and that he would be able to make the balloon payment by using farm profits, refinancing the Bank's loan, or selling off parts of the operation.[59] The bankruptcy court concluded that the projections and Dalsted's testimony provided reasonable assurance that the Woods would have excess cash from their farming operation to reduce or pay off the Bank's claim. Because there was evidence in the record supporting that conclusion, the bankruptcy court's finding that the Plan was feasible was not clear error.

### D. The Bank offered insufficient support for its request for attorneys' fees and expenses under § 506(b) and the court did not err in denying them.

▮ Section 506(b) provides that oversecured creditors may recover as a part of their claim fees, costs, or charges provided for under their agreements or applicable non-bankruptcy law to the extent the fees are reasonable.[60] The Bank has an allowed secured claim, is oversecured, and the loan documents contained an agreement between the Bank and the Woods allowing payment for fees and expenses. But, because the Bank failed to offer enough detailed evidence to allow the bankruptcy court to evaluate whether the fees sought were reasonable in the circumstances, the bankruptcy court's refusal to add them to the Bank's claim must be affirmed.

▮ The bankruptcy court concluded that the Bank failed to present evidence as to the reasonableness of these collection costs and expenses and that the collection costs were a direct result of the Bank's declining to close on the permanent loan proposal in 2009. The Bank bore the burden of proving the reasonableness of the § 506(b) fees it requested.[61] Federal Rule

56. *In re Hopwood*, 124 B.R. 82, 86 (E.D.Mo. 1991); *In re John V. Francks Turkey Co., Inc.*, UT–98–066, 1999 WL 565883, at *4 (10th Cir. BAP Aug. 2, 1999).

57. Exhibit 2, Woods Farm Monthly Cash Flow Statement and Production Plan, *in* Supp. App. at 1–7.

58. Tr. of May 10, 2011, Testimony of Norman Dalsted at 268, *ll.* 9–14, *in* App. at 559.

59. Tr. of Aug. 8, 2011, Testimony of Reson Woods at 31–32, *in* App. at 905–06.

60. *In re Sun 'N Fun Waterpark LLC*, 408 B.R. 361, 366 (10th Cir. BAP 2009). There is no indication that the fees sought in this case were part of a state court judgment as they were in *Sun 'N Fun*.

61. *In re Hedstrom Corp.*, 333 B.R. 815, 821 (Bankr.N.D.Ill.2005); *In re Biazo*, 314 B.R. 451, 459 (Bankr.D.Kan.2004).

of Bankruptcy Procedure 2016 governs § 506(b) claims for attorneys' fees from the bankruptcy estate.[62] That rule requires that the applicant file a detailed statement of the time expended, services rendered, and expenses incurred so that the bankruptcy court can determine whether the requested fees and expenses are reasonable.

At trial, the Bank attempted to admit Exhibit HH, a Loan Balance Summary that referred to total "Expenses Incurred Per Bid" and "Additional Expenses and Fees."[63] The additional expenses included an additional $78,000 in attorneys' fees and expenses. But because the Bank had refused to supply any supporting documentation, the bankruptcy court declined to admit that portion of the exhibit.[64] The Bank president testified that the Bank had paid attorneys' fees in connection with both pre- and postpetition enforcement efforts against the Woods.[65] Without detailed time records, descriptions of tasks performed, or itemization of costs, the bankruptcy court concluded that it could not determine what fees were incurred when. Because the Bank failed to provide any of the information necessary to determine if the services rendered and time expended on each task was reasonable, the record supports the bankruptcy court's refusal to allow the fees as part of the Bank's claim.

We likewise reject the Bank's argument that disallowance of its collection fees and costs was inconsistent with the terms of the Plan which defines an "allowed claim" as one filed under § 501 and to which no objection was filed. The Bank also claims it had no notice that its claim would be challenged at the hearing. First, in the Plan, the Woods "reserve[d] the right to object to what [the Bank] asserts as its Allowed Secured Claim[.]"[66] The Plan also stated "[t]he exact amount of this monthly payment shall be determined based upon the amount determined to be [the Bank's] Allowed Secured Claim as of the date of confirmation of the Plan."[67] One of the Bank's grounds for objecting to the Plan's feasibility was that its secured claim continued to grow as accrued interest and costs accumulated.[68] The Bank cannot have been surprised that the amount of its allowed secured claim would be an issue at the confirmation hearing. It is more likely that the Woods may have been surprised by the Bank's demand for an additional $96,283, which was only raised on the day of the August 2011 confirmation hearing without either a formal application or any meaningful itemization of time and expense being filed.

The bankruptcy court did not commit clear error in disallowing the Bank's claim for attorneys' fees and collection costs.

## IV. Conclusion

We conclude that the bankruptcy court correctly held that the Woods met the farm-debt test. We also conclude that *Hardzog* has been overruled by *Till* in the Chapter 12 context, and that an appropriate cramdown interest rate must equal the

**62.** *Hedstrom*, 333 B.R. at 822.

**63.** Exhibit HH, Loan Balance Summary as of Aug. 3, 2011, *in* App. at 1347.

**64.** Tr. of Aug. 8, 2011 Hearing at 153–57, *in* App. at 1027–31.

**65.** Tr. of Aug. 8, 2011, Testimony of Mark Daigle at 157, *ll*. 8–25, *in* App. at 1031.

**66.** Amended Chapter 12 Plan of Organization at 5, ¶ 5.2.4(a), *in* App. at 187.

**67.** *Id.* at 4, ¶ 5.2.2(a), *in* App. at 186.

**68.** The Bank's Objection to Confirmation of Debtors' Amended Chapter 12 Plan of Reorganization at 6, ¶ 34, *in* App. at 207.

212

national prime rate enhanced with a risk factor. The facts in this case support the bankruptcy court's conclusion that an interest rate of 5.25%, based on a prime rate of 3.25% plus a 2% risk factor, would give the Bank present value for its allowed secured claim as required by Chapter 12. Evidence also exists supporting the bankruptcy court's determinations as to the repayment period and terms, as well as feasibility. We further conclude the bankruptcy court did not err in disallowing the Bank's claim for collection costs and attorneys' fees.

We therefore AFFIRM the bankruptcy court's order confirming the Woods' Corrected Amended Chapter 12 Plan.